The case for argument this morning is 21-1969, University of Massachusetts v. L'Oreal. Mr. Lemkin, whenever you're ready. Nice to see you again. Good morning. May it please the Court. Despite the patent's express definition of skin enhancement, which is a noticeable decrease in the amount of wrinkling, dryness, or other listed conditions, and recitation of a specific effective dermal adenosine concentration, the district court held that the phrase, ''amount affected to enhanced skin condition'' is indefinite because the patent supposedly allows for purely subjective determinations of whether there was a decrease in the amount of a listed condition. You may be right that it supposedly allows for a purely subjective, but it explicitly allows for subjective evaluations, right? And that word must mean something. They could have said evaluations by patients and doctors. They said subjective evaluations. So I don't know how to parse the difference between subjective and purely subjective. We've got dictionary definitions for subjective. So the question, for me, it comes down to what does subjective mean, and who gets to decide that, and how is that decided? And your suggestion there that it's a jury is also one that I'd like to get into with you. So if you could start there for me. I think we'll start with the patent, because the patent says that subjective evaluations are permitted in the art. They're well-known in the art. So you would look at the ones that are permitted in the art. And the art, immediately after that statement, it cites a study, Olson. And if you look at Olson, Olson is a study of 296 patients. It's a double-blind study. It has dermatologist assessments, subjective, they're looking at the patients. It has patient questionnaires, potentially subjective as well. But when you have a study, you eliminate that subjectivity being random, because you do a properly controlled study. And in this art, that's permitted. And if you look at the next thing that's decided, it's also a study. And it is Olson again. It's a 1997 Olson study. Again, a study. And when you look again at the next one, or actually it proceeds a little bit, Grove. Grove is once again a study of 24 individuals. And it's just well accepted in the art that when you are looking to see whether or not you have improvement or something's effective at improving a particular condition, lessening the amount. You have objective criteria, lessening the amount. You're allowed to have these subjective criteria. But you use a study in order to do that. And there's a reason for that. But what does subjective mean? Does it mean, I mean, it can mean one of two things. But I think the definition is relation to judgment and peculiar to a specific particular individual or modified or affected by personal views, experience, or background. Do you accept that as the definition of subjective? I think subjective means that you are using your judgment in the evaluation. And skilled artisans like people who are looking at skin all the time, they are going to be deciding based on their judgment. What about patients, though? Let's talk about patients. You can also do patient questionnaires. But no one would say, gee, one patient has decided that this has improved her skin. Therefore, it is an effective amount to reduce the fine lines and wrinkles. You would have to do a study. Because that's what effective amounts are about. They're about whether or not it works across a population. And that's how the art works. It looks at effects across a population. And when you look across a population, you can do a proper, controlled study to eliminate that. You have the same observer before and after. You have placebo effect. You have a double-blind study. These are all things that are accepted in the art to reduce it. So let me move on to the second part of my question. Because I don't want to monopolize this too much. If I could have one sentence left. If you couldn't have some element of subjectivity in there, you couldn't have a patent, for example, for applying an effective amount of a pain reliever. Because the patient's the one who feels the pain. And that's certainly much more subjective, how much pain do you feel, than the externally observable criteria of lessening of amount, reduction in quantity of observable things on somebody's face. I'm sorry, Judge Prosser. But it does use the word subjective. And subjective has to mean something. They could have just said evaluation by patients. And I'm not sure we would be here. Certainly if they had left out that word. But that word is modified by what follows. It says, in the art. And the art accepts people looking at skin and doing an evaluation without actually counting. But saying, yes, that looks like it's an improvement. And as long as you're doing it as part of a study, as long as you're doing it across the population, that's how people determine therapeutically effective amounts. And that's how it's done in vaccines. You wouldn't just ask one person, did you have less symptoms because you had the vaccine? You'd ask a whole group and you'd properly control. And you would determine, yes, indeed, this does reduce the symptoms. Even though to some degree people are saying subjectively, I felt better or I did not. Who makes the decision? There's a suggestion in your brief in a number of places that we're looking at a juror. And could a juror do this? And I'm not seeing what the role of the juror would be here. This to me seems quite parallel. And I think the cases support that this is parallel to claim construction. So you can have extrinsic evidence, but that that's for the judge and not a jury. So why am I wrong about that? There's a case called Bombardier Recreational Products versus Arctic Cat, admittedly unpublished, but it recites some of the... Doesn't that case merely say that it's okay to give it to the jury? Yes, it says it is at least permissible. You're arguing that you have an entitlement to a jury to determine, if not, certainly not the claim construction aspects, but there's several real-world, what would scientists know about consistency or methodology questions that go into reasonable certainty. Like Judge Prost, I've had some trouble trying to figure out why, whether there is controlling precedent on whether those aspects, which are not really claim construction aspects, are jury questions. And you're correct that Bombardier says, to the extent you're looking at claim construction, that's not going to the jury. It's only when you're looking at extrinsic facts, and it lists some of the extrinsic facts here. Well, you can have extrinsic facts under TEVA and in claim construction, and there's no suggestion, and I think we all accept, I can't pinpoint who said what when, that that's not an issue that goes to the jury, that's for the judge. And even in TEVA on remand here, where we talked about what the Supreme Court said about standards of review, yada-da, they are talking about a judge making that determination, just like in claim construction. So where is the juror involved here? So we believe that the juror would be involved, that if the court, it would be at least permissible for the court to allow the jurors to determine those extrinsic facts and make a determination in deafness, as happened in Bombardier. But even if we're talking about the court making the determination, it's still subject to the clear and convincing evidence standard, and the court is still going to have to account for the evidence on both sides. And in this case, the court didn't look and say, you know, under the methods in the art, these types of studies, say that L'Oreal uses as well, it's not, you can't actually determine whether it is this. They simply said, well, there's subjectivity here, and therefore I'm going to throw it out. But the art allows for that degree of subjectivity because it has studies. L'Oreal itself uses these studies. Well, where's the evidence? I mean, you had your chance, right? I mean, what can you point me to in the record where this is the argument that your experts pointed to and that your expert talked about these studies and talked about what subjectivity is? Sure. So if you turn to page 1,200,478 of the record... Wait, I'm sorry. Are we in the second book? 1,200... Yeah, it's 12,478. Okay, thank you. It's paragraph 185, and it says, here's the methods, and it says, comparative studies have shown correlation between assessments performed using different metrics. Can I just double-check something? I think in your response to the summary judgment, you have to file some here, the facts that you cited 186 but not 185. Is that just a typo? I think that's just a typographical error, Your Honor. And it's very clear because it goes on and says, numerous publications and other patents describe compositions that are directed toward enhancing the condition of skin, and a skilled artisan would have well understood that the efficacy of this method could be evaluated in a similar way. And it cites some of the studies that are in the patent and additional studies in that footnote. And then if you turn to page 15176 and 15522, these are actually L'Oreal studies. And what does L'Oreal look at? You've got to give me a chance. I apologize. 15176, 15522. These are L'Oreal studies, and they're under seal, so I'm not going to go into detail on them. But L'Oreal itself relies on patient questionnaires and dermatologists' assessments in determining whether or not its products are effective for its advertised purposes, subject to an FTC injunction that says you have to have support for your assertions that this does reduce fine lines, wrinkles, or whatever the condition. So on the assumption that accepted methodologies can include subjective self-assessment as data, there would remain the question whether the various methodologies produce sufficiently inconsistent results, inconsistent in a way material to whether something is in or out. Did you really create a triable issue in your summary judgment papers about the question of consistency? Oh, I think so. This comes down to the credibility of the experts. And I don't think there's evidence from the other side that in the context of adenosine, in the context of the types of studies one runs according to the patent itself and the specification, you're going to get such varying results that you can't tell whether you're in the patent or out. But I also think that it doesn't matter because the patent actually tells you the therapeutically effective amount. You don't need to go to those studies because the patent tells you the therapeutically effective amount at the dermal layer is specifically 10 to the negative 7 molarity, which is 10 to the negative 7 moles per liter. If you have that molarity at the dermal layer, you are applying the effective amount. Just one basic question before we get into the details of that. Is there anything in the spec that tells us what the amount that is put on the epidural layer of the skin gets you? I mean, what is in the claim language, I understand, is the concentration that is measured at the dermal layer. Am I right about that? That's correct. Do we know anything about what the amount that is administered on the epidural layer to get that amount on the dermal layer? The patent does not tell you that answer except in one respect. So first, the evidence showed on page 12,474 of the record that a skilled artisan would know how to prepare a composition that would deliver the recited concentrations of the dermal cells. You have to be patient. Give me the site first and let me get to it. 12,474. I believe it's at the top. I'm reading through my notes. It says, a skilled artisan would have known how to prepare a composition that would deliver the recited concentrations of the dermal cells. So we have a record that shows that skilled artisans know how to do this. But on top of that, the patent... I'm sorry, I'm on 12,474. And what paragraph are you looking at? 172. Oh. There's a paragraph. Oh, okay. Okay. Okay. Thank you. But in addition, the patent also gives you the information about if you're looking for an absolute number. If I get to ask the Court, and I will go slow this time, Judge Proust, I apologize, to go to column 2 of the patent. Yes. Excuse me, column 5 of the patent, which is on page 69 of the appendix. And it says, for example, and this is line 35, dosages for a therapeutically effective amount for topical application, so this is talking about in the composition that goes on your skin, not what penetrates the dermal layer. For topical application, it would be in the range of 100 nanograms to 10 milligrams per treated surface area per day. So you have an amount there. And the key to the whole thing is that when the patent says this, the patent's very clear about distinguishing between the topical composition, what's topically applied, and the concentration of the dermal layer. For the topical composition... I'm sorry, when you say the patent is clear... The patent claims. The claims, right. Because the patent is, I think, about as far from clear about that distinction as it is possible to get. No, I think it's relatively clear, especially after you've amended the claims, because you look at the data and the data's talking about the dermal layer there. Can I ask you about the wear-in clause? What thing is the thing measured in liters in the denominator when measuring the molarity figures in the wear-in clause? That's the dermal layer. So you're looking at the concentration at the dermal layer. So it's moles per liter of dermal. And that's, I think, pretty obviously different from what the concentration is in which is a the denominator is the solution of the composition. So we're not talking about a a composition put on the skin in which there's a similarity with the number of liters of the solution, namely the composition being the denominator. All of that going down through the epidermis to reach the dermal cell and some of it is adenosine, some of it is the solution, and you're now applying that solution with adenosine in it measured as a concentration to the dermal cells. You want to translate the wear-in clause into an amount of adenosine gets to the cells forming a concentration in the dermal cells of those amounts. So I think that's mostly right if I'm understanding it correctly, Your Honor. I think the wear-in clause is very clear. It says, the adenosine concentration applied to the dermal cells. So when you're looking at the dermal cells from one layer to the next... That's a very strange use of the word concentration. No, because I think that is... You mean the adenosine, what's applied to the dermal cells is the adenosine. It's not a molarity. It is the actual moles of adenosine. No, Your Honor, because at that point it's absorbing through the layers of the dermis. And so the concentration is going to be the concentration in the dermis, like you would talk about the concentration in a bloodstream. You're looking at, it's diluted to some degree, but it's actually... Why would you use the language of concentration applied to, language that I would think means you have to measure the concentration before it gets to the thing? Well, you certainly would measure concentration before it gets there. So maybe I could just talk about the contradistinction between the topical composition and what happens at the dermal layer. The wear-in clause, you have a very specific, it says, the adenosine concentration, so you have a specific one, applied to the dermal cells, so it's reaching the dermal cells, and it gives you a specific number. That suggests that it's actually the number of adenosine moles in the leader of the composition, that the V has, that's the antecedent, isn't it? It says the concentration applied to the dermal cells. But when you go up and you're talking about the topical application, it says comprising topically applying to the skin, a composition comprising a concentration of adenosine. So it is agnostic. It's not specific about how much adenosine is in that. I would think that the definite article V, which is a reference back to the antecedent, would be to the solution, namely the adenosine in composition. I don't know what else is in the, in solid, right, in the solution. So, Your Honor, it has to be measured at the dermal layer. You have to see what's reaching the dermal layer, because it says applied to the dermal cells. But you don't want to do that. You don't want to do that, because you don't want to measure a concentration until it's in the dermal layer, and you're using the dermal layer as the denominator. Remember, the dermal layer isn't just sort of a sudden event. You have, as it goes through, it's going through the dermal layer, through the epidermis, to the dermal layer, and through different layers of the dermal layer. And our understanding is that when you're looking and measuring that concentration at the dermal layer, you would include the dermal cells as the denominator, and you will include the adenosine as the numerator. When you're talking about the topical composition, though, the language is very different. It uses a concentration of adenosine, an amount. So it uses nonspecific, generic terms. Well, how do you know? How much do you put in the topical composition that goes on the skin? You put the amount in the topical composition that will achieve the adenosine concentration at the dermal layer. So how much do you put in? You put in enough to get to those concentrations in the dermal layer. And it's very clear from the science that was there, they were looking at what reaches these dermal cells, what's reaching the fibroblasts. And if you look at pages 69 to 71 of the appendix, they're looking at what's touching the fibroblasts. And it's a concentration. It's not going to be touching the fibroblasts if it were. I'm sorry, you were referring to the experiments. The experiments, exactly. But there, isn't the concentration measured as a certain amount of adenosine in a liquid that is then being put into the little petri dish or something with the fibroblasts? The fibroblasts are not themselves the denominator. I think the measurement there is the concentration sitting in that vial as it's applied, not a concentration so superficially. And the evidence showed that when you're doing that number, and if the fibroblasts count for anything, remember, we're in a petri dish, so that's going to be a very, very small number. When you're trying to penetrate the dermis, and you're trying to reach all those cells in the dermis to enhance all the things that are getting enhanced here, you're going to want to put a concentration in that dermis. It's going to be applied to the dermis, the entire layer. That's going to be the concentration all the way through, not just the concentration at the top layer. And I think that both the PTAB and the district court understood that the dermis is the layer including that dermal layer, that concentration there. When you're talking about the topical concentration, that isn't specified because it says a concentration, an amount. Right, so in a way that I think is probably obvious, if we were to conclude that the district court was wrong on this threshold claim construction question, and that the where-in clause actually does refer to the concentration of adenosine in the composition, what do we do here? Well, so if that were the case, then this would have to be remanded, because the district court didn't evaluate it under that standard. But I think that's quite clearly wrong, because it really does very clearly distinguish between two things. A topical composition... What is claim one? Claim one says applying to the skin a composition comprising a concentration of adenosine in an amount. So it is very nonspecific. It's very general. Some concentration, some amount, is going to be applied. And then what do you have to do? You have to make sure that the adenosine concentration applied to the dermal cells, when you get down to that dermal layer, you have this... Right, I guess my problem, that the problem, and I just could be failing to understand this, it seems to me that it would be one thing to say something that you don't say, and that thing would be take the cream, which is a composition containing adenosine and other stuff, and that has a certain concentration, the adenosine, over the volume of the rest of the cream. You see how much of that whole thing hits the dermal cells, and you measure that concentration in that whole amount of cream that is going through, and that's... because that's what applied to seems to me to mean as a matter of plain language. You don't want to do that. You want to take the adenosine molecules, measure them, a certain number of moles, over the leaders of the dermal cells, which seems to me not at all what the language says. And if the language isn't clear, then it seems to me the spec and the prosecution history push really, really strongly in favor of saying the 10 to the minus third to 10 to the minus seven molarity is all about the composition, the thing put on the skin. No, Your Honor. I think that all points the exact opposite way. Because remember, the wearing clause was added at the examiner's request, and the wearing clause was very clear, and you said when you added it that all we're doing here is putting basically the limitation of dependent claim three into claim one. You never called any attention until after the fact, after the allowance, to the idea that this addition of the dermal cell language was radically changing everything about the measurement being done. And you never said, here's how we're going to measure that. Suddenly the denominator is no longer the composition. It's something else. That's why I think, am I right in thinking that remembering that the board said this prosecution history may not be quite strong enough, but boy does it look like this sort of favored L'Oreal's point. It said certainly not enough to show that it's a disavowal where you would say that the concentration... Why would you need a disavowal? This is not a narrowing. This is a changing of meaning. Well, you need a disavowal because the language and the district court thought the language was very, very clear. And the PTAB understood the language was very, very clear that the measurements at the dermal layer are not the topical composition. Did the PTAB understand how you measured this concentration in the wear-in clause? Yes. There were extensive affidavits about how you measure the wear-in clause. Including the fact that the denominator there had nothing to do with the solution. Exactly. And there were arguments from my colleagues that it is indefinite because those don't make that measurement. On the other hand, we relied on cell diffusion testing saying, oh no, you can make that measurement. You go measure it and you measure how much has gotten through. And that is the same debate that's actually occurring here. PTAB ultimately didn't decide it. They decided the text was absolutely clear. There's one composition that's topically applied. It can have a quantity of didenosine, an amount, and then when you get down to the dermal layer, it says wherein the amount of cells, so you're reaching and penetrating the dermal cells, that's the amount. Imagine the second layer of dermal cells, not the first. The second layer is only going to get the concentration of what's up there with the first. The third layer of dermal cells, it's only going to get what's up there with the first two layers. When you're trying to figure out what's reaching all the dermal cells in that layer, that's the concentration that's there in the dermal layer. I think I'm well past my time at the moment. If the Court has no other questions, I'd say one minute perhaps on jurisdiction, which is simply to say that it was jurisdiction over L'Oreal SA. It was error to require us to try this on affidavits when we're just simply strangers to the corporation. Can I ask what difference, if any, to any substantive issue in the case would it make if SA is here? It's simply a matter of who's liable. In terms of the substantive issues of the case, it doesn't make any. We were assuming that we would get we're asking for that relief, but if we are going to lose on indefiniteness, it doesn't really matter anymore. But we're hoping we're not going to lose on indefiniteness. Maybe I was asking if you were going to win on indefiniteness, would other issues in the case be affected? Assuming USA is not insolvent or something? Yeah, I don't think so, Your Honor. I think it's simply a matter of who's liable and who we can get discovery from and things like that. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Unless Your Honors would like to direct me otherwise, I will begin by addressing plaintiff's contention that the skin enhancement language does not limit the claims beyond the required concentration. Skin enhancement limitation appears twice in the claims, the preamble, as well as the body. The preamble was added to the claims in response to an examiner rejection and was specifically relied upon to avoid anticipation of rejection over the Cronstein reference. That's 2689 in the appendix. Regardless, the body of the claims require an amount effective to enhance the condition of the skin. In column 2, lines 38 to 40 of the specification states that this term means an amount that enhances skin condition when applied to skin. This is a functional definition that avoids something like a minuscule amount of adenosine at the required concentration being there only briefly and having no effect. Perhaps more importantly, concentration and amount are separate claim terms, and there really can't be a debate that they mean different things. Now, Dr. Dobson was plaintiff's 30B6 witness with respect to the topic of the effect of adenosine on the concentration... Can I just move closer to what I think we're focusing on when talking about the indefiniteness aspect, which I think centers around this column 5 language and the reference to subjective evaluations, either by the patient or by an individual physician. Mr. Lampkin says, look at that language from the point of view of what you agree to be the relevant skilled artisan, which is a science type. Science types in this field know what to do with essentially individual reports. They don't take any one as gospel. They factor them in, looking at a global population, not global, but a large sample population to figure out what conclusions to draw from a variety of evidence, some of which are individual self-assessments, and that that, in this field, provides enough reasonable certainty. What's wrong with that view of this quite central language? I'll respond to that in two ways. First, the specification is very purposeful in referring to this as subjective evaluations by a patient. This is talking about who is receiving the composition. The claims say you're going to give this to a mammal having skin-containing dermal cells and see if it enhances their skin. That's what's required by this method. That is subjectively performed. An individual who receives the cream will decide, based on their judgment or opinion, whether or not they think, for example, there's a noticeable decrease in their wrinkles, and the record is replete with the problems of that. That is true, but the question for reasonable certainty is whether a relevant, skilled artisan would face unreasonable uncertainty. The reasonable, the relevant, skilled artisan is not the patient. It's not even the individual doctor. It's this person that you defined as having certain kind of scientific credentials and experience who would not, the argument goes, take any individual patient's word as part of a data pool. Well, I think the pose is being told, instructed by the specification to use subjective evaluations by patients. They were told that's part of a data pool. They were told that that's how you do it. Even if you look at subjective self-assessments, and we'll go to the second part of the answer to this question, the Olson reference was brought up, for example. If you look at the 0.05% concentration that was found supposedly to be effective in that study, the global response, overall assessment for skin, was different. The patient's self-assessments, the overall questionnaires found no effect, which was different than clinicians. Is that the one where the p-value was so high that you wouldn't deem it as statistically significant? It was outside the statistical significance, but when you look at the individual results, even for roughness, the patients thought that there was no improvement in roughness. Clinicians felt otherwise. And this is what Dr. Casting, L'Oreal's expert, if you look at the appendix starting at 12.331, he goes through the problems with these subjective assessments, including the Olson article, and he talks about that they produce these conflicting results, even if you're using assessments, and putting aside that I still submit that these are specifications calling for subjective evaluations by individual patients, even if you accept that it's an assessment. There is no response from plaintiff's expert, Dr. Micheline Ocone. She talks about objective methodologies. She never takes on subjective assessments. She never takes on what Dr. Casting says about Olson, or any other reference that Dr. Casting explained in detail. Can you turn to paragraph 185, the one that we focused on on the briefs and that we talked about today, and respond to what Mr. Lampkin said about why that is so helpful to him? Yeah, and I think this is, when you look at that paragraph, Dr. Micheline Ocone talks about the second sentence. These methods could include objective clinical evaluation scales or tests. She goes on to list a number of computerized objective tests. She talks about correlations, and she never, though, talks about the problems of subjective assessments. Dr. Casting walked through that for pages, and she simply did not take issue and did not address subjective assessments at all. She focused on objective methodologies, and that's been the thrust of her opinion, that you could use objective. The specification tells you you can't. And this is not disputed. Again, Dr. Ocone... The specification doesn't say you can't use objective. No, no, of course. The specification says you can't ignore subjective. Unless the claim... These claims, of course, could have been written to pick a methodology and could have said, we're going to assess it this way, this objective method to assess enhancement of the skin condition. It doesn't do that. Well, if the spec had just referred to there are methods of measuring improvements in skin conditions are well-known in the art, and cited a couple, that would have been sufficient too, right? What gets you into trouble here is the shout-out to including subjective evaluation. Am I wrong? No. If this had just said, if it had full stop, dryness, et cetera, methods of measuring improvements in skin condition are well-known in the art. C.E.G. Olson, and blah, blah, blah. That would certainly be a very different situation. But to your point, Dr. Dobson, again, he was a 30B6 witness from plaintiffs on effects of adenosine on the skin. And he unequivocally testified that these claims involve subjective assessment. So there's no dispute on that. That's part of these claims. You can't erase that. And adding objective methodologies can't save a subjective assessment. So Mr. Lankin's other argument is, even if you accept the words subjective, however grudgingly, there's still that the case law says purely subjective. And there's a distinction I think perhaps he was trying to draw between the use of subjective in this context and purely subjective, which is what our cases call out as being improper and indefinite. Yes, the cases talk about you have to have objective boundaries. And you can't have objective boundaries when there's subjectiveness in the claims. So do you think any minimal amount of subjective, I mean purely subjective, we might have said it because that's what we thought, doesn't rule out something less than that explicitly. But if it's, you know, if it was two out of a hundred things that you look at, I mean if it was a little bit of subjectivity possibly entered into some phase of the fact finding, does that make the claim indefinite? I mean, I'm asking you, is there some point at which it's de minimis? There certainly, I wouldn't say that there couldn't be some set of facts in which that's possible, but here, 100% of this assessment, whether you're looking at dryness, roughness, wrinkles, laxity, they all are subject to the subjective evaluation. So this permeates the claim scope, and you can't have objective boundaries when it's infected with a subjective evaluation. But there's nothing specific, and I mean, I guess it was up to the parties to ask below, but none of it were the experts asked the frequency with which subjective, one, what subjective evaluations really mean, because there and two, the frequency with which these methods are used to make these assessments. You have the chance to make your record, I don't know who that cuts against, but is there anything on the record that talks about that? In the prosecution, you're asking? No, I'm talking about the record before the district court judge, the expert testimony and so forth. Yes, again, if you look at appendix 12331, Dr. Casting spends a number of pages talking about the problems with subjective assessments and the conflicting results, and that, again, is not responded to. But the frequency of use? The frequency of use, I think that is conceded. Again, Dr. Dobson says these claims are assessed involving subjective assessments. He never said that it's only sometimes, only for certain conditions. He's unequivocally What about frequency of use among artisans in the field at L'Oreal's labs and other people's labs? Do they get patient self-assessments as part of their evaluation? Again, that was an argument at summary judgment, but what the record shows is that certainly patient self-assessments are looked at for informational marketing purposes. There is nothing in the record that's suggesting that you're making a decision about whether a patent claim is satisfied or not using subjective evaluations, and this court's law says that you can't do that. So, again, L'Oreal, the art looks at what patients think is useful information, but it's not what is required for reasonable certainty in a patent claim. What about, I mean, the other side rests a lot on Sonics, and Sonics I think was the case where the district court did say, this is subjective, this is visually negligible or something like that, and our court said, no, it's not subjective. And it distinguishes between something just because an individual is looking at it and can see it versus something like using judgment or opinion like aesthetically pleasing. I think the other side is suggesting that subjective in this context might mean the former, that it's something visible to the naked eye, and not necessarily exclusively this opinion, you know, subjective stuff. What do you say to that? I think Sonics is dramatically different in the sense that there the evidence was undisputed that it was a single objective baseline, the normal human eye, what can be seen? Could these microscopic images be seen or not by the normal human eye? Opposed would apply that single objective standard to decide what is infringing or not. Why isn't that what this case is talking about though? If you're talking about a patient assessment, a patient has a normal eye, presumably, and they're looking at their skin, and they're saying, is it dry, or did the wrinkle go away? Why isn't that what's normally visual? Because again, it's in the evidence of record that I pointed to from Dr. Kassing and otherwise, shows that patients, when they look at themselves in the mirror and say, have my wrinkles decreased? There are things like lighting and amount of sleep and mood and facial expressions can alter the perception. It comes down to it's a judgment or opinion of whether someone thinks I detect a difference in my skin, and that's the same for patient self-assessments. That's how they provide results, like I think it's a little bit improved, I think it's better, I think it's good. It's all subjective opinion, which is why, if you are talking about a claim scope that can be determined using the subjective opinions of just one person, which can vary from person to person, that's the common thread amongst datamized, interval licensing, intellectual ventures, all those cases focus on that, and that's what's involved here, because again, what the specification teaches, tells the pose of what to do, and again, it's not disputed in this case that it applies to these claims. These claims could have been written differently, and they weren't. Your argument sounds like it depends on the assertion that this half sentence in column five tells a POSA that the POSA must make its determination on the basis of a single patient's self-assessment. Why would you read the sentence to say that? That's ridiculous. I think that the specification tells a POSA how to conduct a test in one of the ways, it's told many different ways, but one of the ways is you evaluate it by subjective assessments by a patient. An individual patient, even though the citations and everything else makes the common sense point that of course a POSA would use a pool of patient self-assessments to make an evaluation, this POSA is a lab person who's trying to decide whether the product to the normal human eye, let's call it, would produce a noticeable decrease in wrinkles. Yeah, and again, I think that's what the patent tells and that's what Dr. Dobson testified to. It's not disputed, but I would again go back to even if it's patient self-assessments. Dr. Casting pointed out the problems. It's a general conflicting result. Oh, that's a completely different story. A second basis would be Dr. Casting's pointing out that even subjective self-assessments provide conflicting results, was not responded to as a district court found, Dr. Michignac-Cohen did not even address subjective evaluations. So that's an independent second basis. And you don't think the paragraph 185 citations to Grove and Grove and is it Olson also in there? I guess just Grove and Grove, which do talk about self-assessments by patients as part of the evaluation in Grove and Grove. I think the context of that paragraph is objective and that's what she states. I would like to move to the claim construction issue, Your Honor. Just one more quick question. What you said was just really an exaggeration of the words in it. It says it can include. In other words, it doesn't say it must include. And the number is unknown. I mean, it could be, it can include, but I don't know who it hurts. It helps. It doesn't cap it. So I think your view would be, well, it's indefinite. We don't know if it does include subjective evaluations and the portion of the evaluation that is based on these subjective evaluations. I thought that was the limits of your argument. Nothing more. And it goes to the fact that what does a POSA do? He's told, one thing is look at a subjective evaluation by patients. Then look at computer topography. It's done completely differently. Then ask what the doctors think, clinical scales, et cetera. The POSA doesn't know what to do, what to use to assess, and the record is clear they provide conflicting results. I would like to spend just a few minutes on the claim construction issue. Of course, if Your Honors have questions, I want to address them first. Yeah. Well, that goes to the standard of review, right, on the claim construction. I'm sorry. No. Go ahead. Just because there are some, I thought, very good questions asked about that. I want to focus, of course, I'm happy to address any questions. We brief the ordinary meeting, the language of the claims that we think supports our construction, but at a minimum raises ambiguities. I want to focus on the specification first, which I think is clear and dispositive, and then briefly talk about the prosecution history. This specification never once  of a volume of dermis. Never once. Instead, the summary of the invention six different times talks about the invention as concentrations in therapeutically effective amounts. And those therapeutically effective concentrations are described, and they correspond exactly with what's in each of the asserted claims, and each time they are said that they're applied to the skin-containing dermal cells. That's our construction taken directly from the summary of the invention. Now, plaintiffs pointed to... The district court accepted, I thought, their construction, not your construction. Are we talking about... Yes, we're talking about the claim construction issue that my friend, Mr. Lampkin, addressed. So you're defending the district court's claim construction. I'm suggesting the district court's and plaintiff's construction was wrong, and that this is an alternative basis where we would prevail based on claim construction. I apologize, Your Honor. There's too many claim constructions. Understood, and thank you. I want to also briefly mention column 2, lines 14 to 17. That's what Mr. Lampkin referred to when he was trying to say that, well, the patent tells you it's the concentrations that get to the dermis. That's wrong. That sentence, when you look at it, it says... It refers to the concentrations used in the above described methods. And again, every one of those methods is talking about applying to the skin-containing dermal cells. We also talked about the claim language and when this wearing clause got added to the claims. As a baseline, the numerical concentration ranges in the original claims indisputably were applied to skin. And the only cited support was again the summary of the invention passage I just referred to. When the wearing clause was added to the claims, they again cited the summary of the invention, same passage, but more than that, and this is at appendix 2702, this is important, the applicant stated that the pending claims, quote, all are based on the application of certain concentrations of adenosine to the skin. They represented, when they added this language in, the wearing clause, that it's concentrations applied to the skin. I thought that the, I don't know, there's another quote on that page when the applicant says, this amendment would add no new matter as it merely includes a range of concentrations of adenosine recited in dependent claims in the specification. In the specification. And that's an excellent point, yes. But was it claim 3, which had this range, I think, the dependent claim, said nothing about dermis or dermal cells. I guess I had read this to be a pretty clear declaration that all that was going on in this amendment was to move into the independent claim the 10 to the minus 3 to 10 to the minus 7 or 6 or whatever it was, that was in the dependent claim, not to change the location of measurement. I think that's exactly right, Your Honor. And the claims, the concentration ranges, again, in the original claims were indisputably all applying to the skin. So to your point, this was moved into the claim, it wasn't some dramatic shift. I guess, I mean, we can look at prosecution history and so forth, but I'm just looking at the language of the claim. Isn't the language of the claim explicit? It says more than 3 says. It says concentrations applied to the dermal cells. And how do you apply a concentration to dermal cells and unbroken skin that this claim requires? It's impossible to do it other than indirectly. And that's the sense of applied being used here, that you apply it to skin, and it gets to the site of action. Yeah, so okay, so it's applied indirectly, but it's still applied to the dermal cells, and that's where the measurement occurs. The key is that when it's applied, and it has to be a concentration as a solution, when it's applied, that's the concentration that matters. And it eventually gets to the dermal cells, that's the site of action. But that's entirely consistent with the specification. I'm getting confused on what your point is and how it differs from the other point. You're saying that the numbers here are the concentration when it's applied in the first instance, and not after it reaches the dermal cells? It's 100 percent correct. And that's consistent with the summary of the invention. It's consistent with the fact that that's how solutions are applied. There is not a single instance in the specification, not even one time, of a concentration being expressed in terms of some volume of skin or dermis. It never once appeared in the specification. But don't you agree that the words of the claim say something more explicit and say something different, that the best reading of words is when the concentration applied to the dermal cells is? And it's not saying applied directly. Again, the only way you apply it... I was going to ask you, how would you say it more clearly? I would say that it's applied in the sense that it's indirect, that you apply it to the skin, it gets to the dermal cells. Just like for example, the specification talks about patches. It's one way to apply this is to first put it in a patch, and then it's still applied topically, and then it gets to your skin through indirect. So it's the sense of the word applied, and we have evidence of record, Dr. Casting explained that dermal administration in the art, this is at 2872 to 7873, that means the same thing is applied to the skin. And Plaintiff's IPR paper is at 2864 equated applied to dermal cells with topical applications. This is how it works when you have unbroken skin. You can't apply it to dermal cells directly. It doesn't work. No, we all agree with that. And we talked to Mr. Lampkin about what's the initial concentration of the application, and how does that differ? And he said, well, it's known in the art or whatever what that number needs to be. Yeah, I would disagree with that and the patent says nothing about it, and that's for a reason. There was only this, there was dermal cell experiments with specific concentrations that were lower, 10 to the minus 4, 10 to the minus 6. The specification is very clear that based on those experiments, they disclose applying solutions of higher concentrations, 10 to the minus 3, to the skin to achieve those effects. This is very straightforward. This is all being invented after the fact by the plaintiffs to say this is how we should read our claims, because they know our products don't infringe under the proper construction. What do you make of the applicants comment on reasons for allowance that, as far as I can tell, for the first time, tries to call some attention to this dermal cell language that was added by amendment? Yeah, I think what's interesting about that comment in addition to the fact that it came after all the prosecution activities and the examiner saying expressly I understand the concentrations to be applied to the skin, they say that the examiner's reasons are not the only reasons for allowing the claims. That's not disagreeing with the examiner. That's saying that there might be more reasons why I should get a patent, but everything you said is correct, examiner. So to include this sort of additional remark of just repeating the claim language after all the clear not only representations of what the claim language meant when it was added, but here we have the prior art being distinguished, multiple prior references based on the composition concentration applied to the skin, including by the way, the 0.1% concentration that L'Oreal's products use, and to say that somehow now we always meant something completely different about some concentration in skin that doesn't scientifically make sense. Do you agree with, I think Mr. Lampkin said this, that if we were to reverse Judge Connolly's claim construction on this point, that the right disposition in this appeal is to vacate the indefiniteness ruling and remand full stop? It would end up in the same place, Your Honor. There's the Durell case, the Sanovian case are examples of this court, given the admission on page 20 footnote 6 that L'Oreal's products exceed the claim range. You have the power, of course, to make a decision based on the record, but if it goes back... It would end up in the same place. It would end up in the same place, Your Honor. If we get sent back on a claim construction, this case would be over. Because there'd be no infringement. But then you would have to drop your invalidity counterclaim. A non-infringement judgment would not by itself, without further words, end the case. We certainly believe that there's invalidity shown, but we think that... If you plan to do that, that's one thing, but that's not before us. And just very briefly on this, and I'll, of course, any other questions, but on the alternative you don't have to reach, the alternative indefiniteness grounds on the concentration limitation, I just want to point to a few places in the appendix. First... Can you just say exactly what you're talking about now? The alternative indefiniteness grounds... Where you can't measure it, there's no specific way to measure it. Precisely, it was addressed briefly. Okay, I think we'll take it on the briefs, we're way ahead of our time. Okay, thank you, Your Honor. Alright, so there's some time I think this gets evened out if we give you about three minutes for your time. Thank you. I'd like to make just two points. One on indefiniteness and the other on claim construction. On indefiniteness, this is at least as definite as phonics where the phrase is visually negligible. This is an amount of criteria, more or less, that are actually concrete. And the fact that the studies can include, meaning you're allowed to rely in part on subjective evaluations, doesn't make it indefinite. Because the art knows how to deal with that subjectivity to make sure that you get consistent results. And there's just simply no finding by the district court that the results are going to be in conflict. That's something the district court didn't address. The experts disagree. Our expert says that they correlate. Their expert says you get conflicting results. But there's no finding that by clear and convincing evidence, no reasonable fact finder could determine that these are so disparate in terms of whether it's going to infringe or not, that you cannot have reasonable certainty as to whether you infringe. The type of subjectivity here is simply subjective evaluation like a doctor listening to your heart. Yes, he uses his judgment to account, but he uses objective criteria to make that determination. Turning to the claim construction, I think the basic problem with taking the concentration at the dermal layer and making it the concentration for the topical solution, is that it's actually scientifically impossible. It wouldn't be the same concentration in the dermal layer, because even their expert concedes, I'll point out at 2077, the topical agents permeate at different rates. The topical solution isn't going to be at the same concentration when it reaches the dermal layer. It's just not possible to have both the same concentration in the topical solution and in the dermal layer. What permeates at different rates? The adenosine and the other stuff in the composition? Other things. In fact, the amount of the adenosine, their expert said, that has to be applied to the skin is much greater than the amount that permeates to a particular layer of the skin, often by large amounts. That's Appendix 2877. Because the skin acts as a barrier, it keeps a lot of the things out, including some adenosine. So when you're trying to figure out how to reach the dermal layer with the corrective concentration, scientifically you can't say, well, I'll apply this amount, and that same concentration is going to be at the dermal layer. You have to apply more at the topical in order to reach that concentration at the dermal layer. I think that's undisputed by everybody, that they cannot be the same thing, because things permeate at different rates, and not everything goes through. Although, just I guess to go back to the thing that I guess I've been hung up on, that would be an argument for saying, look at a concentration in two different places, which aren't going to be the same, where the denominator is the same. It's the other stuff in the composition. It'll change because there's different permeability of the adenosine and the other stuff, but you're doing something completely different. You're now forgetting about all of the non-adenosine parts of the composition, and using as your denominator something else, namely the dermis. So you would look at the concentration at the dermal layer, and it would include additional things, and some things that aren't there, because you're doing a concentration. Some things are flowing into the fluid from parts of the skin. Some things are not making it all the way down there. So yes, your numerator is going to change, the adenosine is going to change, and your denominator is going to change, because other things are probably going to be diluting it, and other things are going to be falling away and possibly be replaced. You would look at a concentration at the dermal layer. But they're not going to match. It cannot be that the topical layer, the topical concentration is the same as the concentration at the dermal layer. And if we read it that way, we would be reading the phrase at the dermis, right out of the patent. The patent starts out by saying there's the skin, and it's got a dermis. Two separate things. And the amount topically applied is on your surface, and what reaches the dermis is a different amount. I don't think it's scientifically permissible. And even at, as you noticed, when they got the notice of allowance, they responded and said, oh, correction, you have to submit concentrations measured at the dermal layer. That's not necessary to preserve your reading, but it certainly is consistent with the reading. And finally, just one final point. I think when you're measuring the fibroblasts, and you're looking at the tests, and this would be appendix 2721, and you're looking at that concentration, the concentration at most, because you have your cells floating in a sea of the fluid, that's basically going to be the concentration surrounding those fibroblasts. It's exactly like looking at the dermal layer and says, what's surrounding these fibroblasts? Well, it's a dermal layer with a concentration of adenosine in it. So if there's no further questions, I appreciate the court's indulgence. Thank you very much. We thank both sides very much, and the case is submitted. That concludes our proceeding for this morning.